# EXHIBIT A

E-FILED IN OFFICE - NE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
26-A-03615-11
4/16/2026 5:01 PM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

ELECTRONIC MAINTENANCE ASSOCIATES, INC. and ELECTRONIC MAINTENANCE ASSOCIATES OF NEW YORK, INC.,

Plaintiffs,

v.

FIRST HORIZON BANK CORP

Defendant.

Civil Action No. 26-A-03615-11

**COMPLAINT**

COMES NOW, Electronic Maintenance Associates, Inc. and Electronic Maintenance Associates of New York, Inc., Plaintiffs in this matter, and hereby file this Complaint against First Horizon Bank Corp, Defendant in this matter, and shows the Court as follows:

**PARTIES, JURISDICTION, AND VENUE**

1.

Plaintiff Electronic Maintenance Associates, Inc. ("EMA") is a Georgia corporation with its principal place of business at 2915 Courtyards Drive, Ste C, Peachtree Corners, GA, 30071.

2.

Plaintiff Electronic Maintenance Associates of New York, Inc. ("EMA of NY") is a New York corporation with its principal place of business at 830 NY-13, Cortland, NY 13045. (Collectively EMA and EMA of NY may be referred to as Plaintiffs).

3.

Defendant First Horizon Bank Corp, ("Defendant") is a Tennessee corporation with its principal place of business at 165 Madison Avenue, Memphis, TN 38103. It may be served through its registered agent, CT Corporation System at 289 S Culver Street, Lawrenceville, GA 30046.

4.

The Defendant is subject to the jurisdiction and venue of this Court

**BACKGROUND FACTS**

5.

Plaintiffs were customers of Defendant.

6.

Plaintiffs and Defendant entered into a contract on September 3, 2015 ("Agreement"), attached herewith as **Exhibit A**.

7.

Plaintiffs maintained two accounts with Defendant. One account ending in 7245 ("Georgia Account") and account ending in 5987 ("New York Account").

8.

The Agreement established a daily wire transfer limit of $250,000.00 per account ("Daily Limit").

9.

Throughout Plaintiffs' banking relationship with Defendant, it was exceedingly rare for Plaintiffs to execute more than five wires a month from the Georgia Account and for any wires to come from the New York Account.

10.

There was no instance in the history of Plaintiffs' banking relationship with Defendant in which Plaintiffs executed the number of wire transfers that occurred on October 22, 2025.

11.

On October 22, 2025, Amber Lamb ("Amber"), who serves as Vice President of Plaintiffs, received a phone call from an individual claiming to be an employee of Defendant.

12.

The caller claimed that an individual was attempting to cash a check at Defendant's Greenville, Tennessee branch and that the transaction had been flagged as potential fraud.

13.

Amber was transferred to another individual who claimed to be with the Defendant's fraud department.

14.

The call with the fraud department lasted over four hours, the caller obtained access to Plaintiffs' online banking login credentials and RSA security token under the guise of the Defendant.

15.

While Amber was on the phone with the purported fraud department, she received a message from Bobbie Docher ("Ms. Docher"), a bank manager employed by the Defendant at the Peachtree Corners, Georgia branch.

16.

Ms. Docher communicated her concern that there might be fraudulent activity relating to Plaintiffs' accounts.

17.

Amber requested Trey Mayfield ("Trey"), who serves as the Chief Executive Officer of Plaintiffs to call Ms. Docher. Trey informed Ms. Docher that there was indeed fraudulent activity occurring with their accounts.

18.

Despite receiving specific notice from Trey at or around 3:30 PM that fraudulent activity was occurring within Plaintiffs' accounts, Defendant continued to process wire transfers from Plaintiffs' accounts.

19.

The wire transfers began at 2:09 pm and ended at 6:24 pm on October 22, 2025. Defendant processed wire transfers for more than three hours after receiving notice from Plaintiffs.

20.

Despite, notice at 3:30 pm that Plaintiffs were aware of fraudulent activity, Defendant processed over sixty (60) more wire transfers totaling approximately Two Million and 00/100 Dollars ($2,000,000.00).

21.

The next morning, Ms. Docher informed Amber and Trey to meet her at the bank, concerned something was wrong. Upon arrival, Ms. Docher informed them that $2,724,290.28 had been wired from Plaintiffs' accounts in a series of transactions on October 22, 2025.

22.

The total amount of wire transfers from the Georgia Account operated by EMA was $195,452.00.

23.

The total amount of wire transfers from the New York Account operated by EMA of NY was $2,528,838.28

24.

To date, Defendant has ignored Plaintiffs' demand letter, attached herewith as **Exhibit B**, and has refused to remit payment for the fraudulent wire transfers.

25.

As of the date of this Complaint, the Defendant still owes a principal amount of Fifty-Four Thousand Eight Hundred Forty-One and 95/100 Dollars ($54,841.95) to EMA.

26.

As of the date of this Complaint, the Defendant still owes a principal amount of One Million Two Hundred Forty-Four Thousand Forty-Six and 77/100 Dollars ($1,244,046.77) to EMA of NY.

**COUNT I: BREACH OF CONTRACT**
**(as to EMA)**

27.

EMA restates and incorporates herein the allegations contained within Paragraphs 1 – 26 of the Complaint.

28.

EMA and Defendant were parties to a valid Agreement under Georgia Law.

29.

EMA performed its obligations pursuant to the Agreement.

30.

Defendant is in breach of its obligations under the Agreement for its failure to prevent wire transfers over the daily limit.

31.

EMA is entitled to recover damages from Defendant totaling no less than Fifty-Four Thousand Eight Hundred Forty-One and 95/100 Dollars ($54,841.95).

**COUNT II: BREACH OF CONTRACT**
**(as to EMA of NY)**

32.

EMA of NY restates and incorporates herein the allegations contained within Paragraphs 1 – 31 of the Complaint.

33.

EMA of NY and Defendant were parties to a valid Agreement under Georgia Law.

34.

EMA of NY performed its obligations pursuant to the Agreement.

35.

Defendant is in breach of its obligations under the Agreement for its failure to prevent wire transfers over the daily limit.

36.

EMA of NY is entitled to recover damages from Defendant totaling no less than One Million Two Hundred Forty-Four Thousand Forty-Six and 77/100 Dollars ($1,244,046.77).

**COUNT III: NEGLIGENCE**
**(as of EMA)**

37.

EMA restates and incorporates herein the allegations from Paragraphs 1 – 36 of the Complaint.

38.

Defendant owed a duty of care to Plaintiffs as a customer and pursuant to the Agreement.

39.

Defendant breached that duty of care to Plaintiffs by negligently failing to stop fraudulent wire transfers after express notice from Trey.

40.

EMA suffered harm by this negligence in an amount to be determined by the jury.

**COUNT IV: NEGLIGENCE**
**(as of EMA of NY)**

41.

EMA of NY restates and incorporates herein the allegations from Paragraphs 1 – 40 of the Complaint.

42.

Defendant owed a duty of care to Plaintiffs as a customer and pursuant to the Agreement.

43.

Defendant breached that duty of care to Plaintiffs by negligently failing to stop fraudulent wire transfers after express notice from Trey.

44.

EMA of NY suffered harm by this negligence in an amount to be determined by the jury.

**COUNT V: VIOLATION OF O.C.G.A. 11-4A-202**
**(as of EMA)**

45.

EMA restates and incorporates herein the allegations from Paragraphs 1 – 44 of the Complaint.

46.

EMA and Defendant agreed that the authenticity of payment ordered would be verified pursuant to a security procedure.

47.

The security procedure included the use of login credential and an RSA security token to verify the authenticity of wire transfer requests.

48.

The security procedures were not a commercially reasonable method of providing security against unauthorized payment orders.

49.

Defendant did not accept the payment orders in good faith and in compliance with its obligations under the security procedure and the Agreement.

50.

The pattern of approximately 90 wire transfers in a single afternoon was wholly inconsistent with EMA's historical banking practices.

51.

Defendant failed to recognize this inconsistency as a clear indication that the payment orders were unauthorized.

52.

Defendant continued to process wire transfers for nearly three hours after receiving notice from Trey.

53.

These facts demonstrate that Defendant did not act in good faith and did not comply with its obligation under the security procedure and Agreement.

54.

As a direct and proximate result of Defendant's violation of O.C.G.A. 11-4A-202, EMA suffered damages in the amount of One Hundred Ninety-Five Thousand Four Hundred Fifty-Two and 00/100 Dollars ($195,452.00) in fraudulent wire transfers.

**COUNT V: VIOLATION OF O.C.G.A. 11-4A-202**
**(as of EMA of NY)**

55.

EMA of NY restates and incorporates herein the allegations from Paragraphs 1 – 54 of the Complaint.

56.

EMA of NY and Defendant agreed that the authenticity of payment ordered would be verified pursuant to a security procedure.

57.

The security procedure included the use of login credential and an RSA security token to verify the authenticity of wire transfer requests.

58.

The security procedures was not a commercially reasonable method of providing security against unauthorized payment orders.

59.

Defendant did not accept the payment orders in good faith and in compliance with its obligations under the security procedure and the Agreement.

60.

The pattern of approximately 90 wire transfers in a single afternoon was wholly inconsistent with EMA of NY's historical banking practices.

61.

Defendant failed to recognize this inconsistency as a clear indication that the payment orders were unauthorized.

62.

Defendant continued to process wire transfers for nearly three hours after receiving notice from Trey.

63.

These facts demonstrate that Defendant did not act in good faith and did not comply with its obligation under the security procedure and Agreement.

64.

As a direct and proximate result of Defendant's violation of O.C.G.A. 11-4A-202, EMA of NY suffered damages in the amount of Two Million Five Hundred Twenty-Eight Thousand Eight Hundred Thirty-Eight and 28/100 Dollars ($2,528,838.28) in fraudulent wire transfers.

**COUNT VII: ATTORNEY'S FEES**
**(as of EMA)**

65.

EMA restates and incorporates herein the allegations from Paragraphs 1 – 64 of the Complaint.

66.

Defendant has failed to respond to multiple letters sent by Plaintiffs.

67.

Defendant has refused to remit payment in full for the amount owing and has ignored EMA's demand for payment.

68.

Defendant's failure to make payments after receipt of the demand letter demonstrates that the Defendant has acted in bad faith, is being stubbornly litigious, and has caused EMA unnecessary trouble and expense.

69.

As such, pursuant to O.C.G.A. §13-6-11, Defendant is liable for all costs and attorney's fees incurred by EMA in this action.

**COUNT VII: ATTORNEY'S FEES**
**(as of EMA of NY)**

70.

EMA of NY restates and incorporates herein the allegations from Paragraphs 1 – 69 of the Complaint.

71.

Defendant has failed to respond to multiple letters sent by Plaintiffs.

72.

Defendant has refused to remit payment in full for the amount owing and has ignored EMA of NY's demand for payment.

73.

Defendant's failure to make payments after receipt of the demand letter demonstrates that the Defendant has acted in bad faith, is being stubbornly litigious, and has caused EMA of NY unnecessary trouble and expense.

74.

As such, pursuant to O.C.G.A. §13-6-11, Defendant is liable for all costs and attorney's fees incurred by EMA of NY in this action.

WHEREFORE, Plaintiffs respectfully request and pray that this Court enter judgment in favor of the Plaintiffs and against the Defendant as follows:

a. As to the claim for Breach of Contract, that the Court find in favor of EMA and against Defendant in an amount to be determined at trial.

b. As to the claim for Breach of Contract, that the Court find in favor of EMA of NY and against Defendant in in an amount to be determined at trial.

c. As to the claim for Negligence, that the Court find in favor of EMA and against Defendant in an amount to be determined at trial.

d. As to the claim for Negligence, that the Court find in favor of EMA of NY and against Defendant in an amount to be determined at trial.

e. As to the claim for Violation of O.C.G.A.§11-4A-202, that the Court find in favor of EMA and against Defendant in an amount to be determined at trial.

f. As to the claim for Violation of O.C.G.A.§11-4A-202, that the Court find in favor of EMA of NY and against Defendant in an amount to be determined at trial.

g. As to the claim for Attorney's Fees, that the Court find in favor of EMA and against Defendant pursuant to O.C.G.A. §13-6-11 in an amount to be shown at the trial of the case;

h. As to the claim for Attorney's Fees, that the Court find in favor of EMA of NY and against Defendant pursuant to O.C.G.A. §13-6-11 in an amount to be shown at the trial of the case; and,

i. That the Court awards such other good and proper relief as it deems necessary at law or in equity.

Respectfully submitted this 16h day of April, 2026

BRISKIN, CROSS & SANFORD, LLC
/s/Michael D. Cross, Jr.
Michael D. Cross, Jr.
Georgia Bar No. 198212
Cooper J. Branham
Georgia Bar No. 402526
Attorneys for Plaintiff

Briskin, Cross & Sanford, LLC
33 S. Main Street, Suite 300
Alpharetta, GA 30009
(770) 410-1555
mcross@briskinlaw.com
cbranham@briskinlaw.com

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
26-A-03615-11
4/24/2026 11:25 AM
TIANA P. GARNER, CLERK

**THE SUPERIOR COURT OF GWINNETT COUNTY**

**STATE OF GEORGIA**

| | |
|---|---|
| **ELECTRONIC MAINTENANCE ASSOCIATES, INC. and ELECTRONIC MAINTENANCE ASSOCIATES OF NEW YORK,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**FIRST HORIZON BANK CORP.,**<br><br>**Defendant.** | **CIVIL ACTION**<br>**FILE NO.: 26-A-03615-11** |

## NOTICE OF FILING

COMES NOW Plaintiffs, Electronic Maintenance Associates, Inc. and Electronic Maintenance Associates of New York, Inc., by and through their undersigned counsel and hereby files this *Notice of Filing,* to submit the contract the Plaintiffs and Defendant entered into on September 3, 2015 ("Agreement"), attached herewith as **Exhibit A,** and the demand letter the Defendant has ignored, attached herewith as **Exhibit B.**

Respectfully submitted this 24th day of April, 2026.

**BRISKIN, CROSS & SANFORD, LLC**

By: /s/ Michael D. Cross, Jr.
Michael D. Cross, Jr.
Georgia Bar No. 198212
Cooper J. Branham
Georgia Bar No. 402526
33 S. Main St., Suite 300
Alpharetta, GA 30009
(770) 410-1555 telephone
mcross@briskinlaw.com
cbranham@briskinlaw.com
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Michael D. Cross, Jr., hereby certify that I have this day served the within and foregoing ***Notice of Filing*** and this ***Certificate of Service*** on all parties via Statutory Electronic Service through the Court's e-filing system.

Respectfully submitted this 24th day of April, 2026.

**BRISKIN, CROSS & SANFORD, LLC**

By: /s/ Michael D. Cross, Jr.
Michael D. Cross, Jr.
Georgia Bar No. 198212
Cooper J. Branham
Georgia Bar No. 402526
33 S. Main St., Suite 300
Alpharetta, GA 30009
(770) 410-1555 telephone
mcross@briskinlaw.com
cbranham@briskinlaw.com
*Attorneys for Plaintiff*

# Exhibit "A"

IBERIABANK

# Wire Funds Transfer Services Agreement

Company Name ("The Client"): **Electronic Maintenance Associates Inc.**
Date: **9/3/2015**

IBERIABANK ("The Bank") and the Client agree that the provision by the Bank and the use by the Client of the funds transfer services described below shall be subject to the terms and conditions contained in this Agreement.

## 1. DEFINITIONS

1.1 Statutory Definitions. Unless otherwise defined in this Agreement, words or phrases shall have the meaning ascribed thereto in Uniform Commercial Code Article 4A: Funds Transfers ("UCC 4A").

1.2 Agreed Definitions. The following words or terms have the designated meanings:

1.2.1 "Agreement" means this Wire Funds Transfer Services Agreement, as it may be amended from time to time, after giving effect to all Addenda and Exhibits hereto.

1.2.2 "Addendum" or "Addenda" means any writing executed and delivered simultaneously with or subsequent to the execution of this Agreement and intended by the parties to supplement the provisions of this Agreement.

1.2.3 "Authorized Account" means the account(s) of the Client maintained at the Bank and which the Bank may debit for any Client payment order executed pursuant to this Agreement. An Authorized Account is any account so designated on any Addendum. In the absence of any such designation, any account maintained by the Client at the Bank is an Authorized Account.

1.2.4 "Authorized Person" means a person authorized to execute, modify, amend, or terminate this Agreement on behalf of the Client.

1.2.5 "Available Funds" means funds on deposit in an Authorized Account and available for withdrawal pursuant to the Bank's applicable funds availability schedule.

1.2.6 "Execute" has the meaning assigned in UCC 4A. When the Bank is also the beneficiary's bank, the term "execute" includes the Bank's acceptance of the Client's payment order for purposes both of this Agreement and of the application of UCC 4A to the transactions covered by this Agreement.

1.2.7 "Security Procedure" means those procedures designated in any Addendum for the purpose of verifying the authenticity of funds transfer communications sent to the Bank in the name of the Client or for the detection of errors contained in any such communication.

## 2. FUNDS TRANSFER SERVICES

2.1 Execution of Payment Orders. The Bank may execute each payment order received by it in the name of the Client as sender, provided that the Client has sufficient Available Funds on deposit in an Authorized Account and provided that the payment order:

2.1.1 Is received by the Bank in the medium and at the place(s) specified on any Addendum or Exhibit thereto;

2.1.2 Complies with any written instructions and restrictions of the Client set forth on any Addendum or Exhibit thereto; and

2.1.3 Is authorized by the Client and is verified by the Bank in compliance with a Security Procedure for verifying the authenticity of funds transfer instructions sent to the Bank in the name of the Client.

2.1.4 Upon executing a payment order, the Bank may, at its option, mail a confirmation to the Client, stating the date and amount of the transfer and account(s) involved therein. Within 30 calendar days after receiving any such notice, Client must notify the Bank of any error or unauthorized transfer, as provided in Section 6.5 below.

2.2 Rejection of Payment Orders. If the Bank rejects or fails to execute a payment order of the Client, then no later than 5:30pm (central time) on the execution date of the payment order, the Bank shall notify the Client, by telephone or other reasonable means, of its rejection of the payment order. If the Client has paid for a payment order that the Bank has rejected or failed to execute, the Bank will reimburse the Client for those funds and pay compensation for the use of those funds as set forth in Section 3.

IBERIABANK

2.3 Identifying Number. The Client is notified that:

2.3.1 If the Client's payment order in a funds transfer completed by acceptance by the beneficiary's bank identifies the beneficiary by both a name and an identifying or bank account number and the name and number identify different persons, execution of the payment order, payment to the beneficiary, or cancellation of the payment order may be made solely on the basis of the number.

2.3.2 If a payment order of the Client identifies any bank by both a name and an identifying number and the number identifies a person different from the bank identified by name, any bank may rely solely on the identifying number.

2.4 Time of Receipt of Payment Orders. The Bank may treat any payment order received after 2:30pm (central time) on a funds-transfer business day as if it were received by that hour or may treat it as if it were received at the opening of the next funds-transfer business day. Bank may change the time specified herein by notifying the Client by telephone or any other reasonable means.

2.5 Cancellation of Payment Orders. A payment order may be cancelled by the Client, provided the cancellation instruction is received by the Bank at a time and in a manner affording the Bank a reasonable opportunity to act prior to the Bank's acceptance of the payment order.

2.6 Debits and Overdrafts. The Bank may debit any Authorized Account of the Client for any payment order executed by the Bank pursuant to this Agreement and any associated fees and charges, as described below, even if the debit creates or increases an overdraft in that Authorized Account. In the event that an overdraft is created or increased, the Client shall cause sufficient Available Funds to pay the amount of the overdraft to be deposited into or credited to that Authorized Account by the close of that banking day. Any overdraft existing at the close of a banking day is immediately due and payable without notice or demand, subject to interest as specified in Section 3.4 below, and may be collected, at the Bank's option, by debiting any deposit account that the Client maintains with the Bank.

2.7 Fedwire, SWIFT, CHIPS, Telex and Applicable Rules.

2.7.1 Each payment order or cancellation thereof may be furthered by any bank by use of any means and routes that Bank considers suitable for the transfer of funds.

2.7.2 The rights and obligations of the Bank and the Client with respect to any payment order, any part of which is carried out through the use of the funds transfer system of the Federal Reserve Banks ("Fedwire"), will be governed by any applicable laws, the regulations of the Board of Governors of the Federal Reserve system, and the operating circulars of the Federal Reserve banks.

2.7.3 Each payment order, or cancellation thereof, carried out through a funds transfer system, including but not limited to SWIFT, CHIPS and Telex, will be governed by all applicable funds transfer system rules, whether or not the Bank is a member of the system.

2.7.4 The Client acknowledges that the Bank's right to reverse, adjust, stop payment, or delay posting of an executed payment order is subject to the laws, regulations, circulars, and rules described in Sections 2.7.1 through 2.7.3 above.

## 3. FEES, COMPENSATION, AND COSTS

3.1 Fees. Client agrees to pay Bank's published fees and charges in effect at the time of the transfer.

3.2 Rate of Compensation to Client. Whenever compensation in the form of interest is payable by the Bank to the Client pursuant to this Agreement, such compensation will be payable at the average of the federal funds rate published by the Federal Reserve Bank of New York for each of the days for which interest is payable, computed on the basis of a year of 360 days.

3.3 Rejected Orders. In the event the Bank rejects or fails to execute a payment order without giving notice thereof as provided in Section 2.2, the Bank shall compensate the Client for the use of funds at the rate specified in subsection 3.2 if, on the execution date of the payment order, there was a sufficient withdrawable credit balance in an Authorized Account to pay for the payment order. Compensation shall be computed based on the number of days elapsing after the execution date to the earlier of five (5) business days or the day the Client receives notice or learns that the payment order was not executed, counting the final day of the period as an elapsed day. If the withdrawable credit balance during that period falls below the amount of the order, the amount of interest will be reduced accordingly. Notwithstanding the foregoing, no compensation will be due under this section if the Authorized Account is an interest-bearing account. No compensation will be due hereunder for any funds withdrawn from the Authorized Account.

IBERIABANK

3.4 Compensation to Bank. In the event the Client fails to pay any overdraft as required by Section 2.6, the Client shall pay the Bank interest at the rate of 18% per annum from the day the overdraft is created until it is paid in full.

3.5 Costs. Each party shall bear its own costs and expenses in connection with the use or provision of the funds transfer services contemplated by this Agreement.

**4. RECORDING AND USE OF COMMUNICATIONS**

4.1 Recording of Communications. The Client and the Bank agree that all telephone conversations or data transmissions between them or their agents made in connection with this Agreement may be recorded and retained by either party by use of any reasonable means.

4.2 Limitations on Bank's Use of Data. The Bank may use the Client's transaction records obtained pursuant to Section 4.1 in any manner and for any purpose authorized by applicable federal and state law.

**5. CLIENT INDEMNITY**

5.1 The Client shall indemnify and hold the Bank harmless from any cost, liability, or expense (including reasonable attorney's fees) arising out of any claim by a third party alleging that a Client payment order contravenes or compromises the rights, title, or interest of any third party, or contravenes any law, rule, regulation, ordinance, court order, or other mandate or prohibition with the force or effect of law (a "Claim"), unless the Claim arises out of the Bank's failure to exercise ordinary care or to act in good faith.

**6. LIMITATION OF LIABILITY**

6.1 Responsibility for the Detection of Errors. Except as may be provided on any Addendum, the Bank is not responsible for detecting any Client error contained in any payment order sent by the Client to the Bank.

6.2 Unauthorized Payment Orders. If a payment order in the name of the Client accepted by the Bank was not authorized by the Client, the liability of the parties will be governed by the applicable provisions of UCC 4A.

6.3 Compensable Damages. The Bank will be liable only for the Client's actual damages and only to the extent that such damages are recoverable under UCC 4A, plus the following damages: The Bank shall not be liable under any circumstance for consequential or special damages under this Agreement, whether or not such damages relate to services covered by UCC 4A, even if the Bank has been advised of the possibility of such damages.

6.4 Standard of Care. With respect to the performance of services under this Agreement that are not covered by UCC 4A, the parties will be governed by a standard of ordinary care. The Bank will be deemed to have exercised ordinary care if its action or failure to act has been in conformity with the Bank's prescribed procedures and such procedures do not vary unreasonably from general banking uses and practices not disapproved by any provision of the Uniform Commercial Code.

6.5 Required Notice. The Bank will not be liable for any interest on the amount of a payment order that was not authorized or was erroneously executed unless the Client notifies the Bank in writing that the payment order was not authorized or properly executed within 30 calendar days following Client's receipt of notification either of the acceptance of the payment order or of the debiting of the payment order to an Authorized Account.

6.6 Force Majeure. Except as otherwise provided by UCC 4A, the Bank will not be liable for its inability to perform its obligations under this Agreement when such inability arises out of causes beyond its control, including, without limitation, any act of God, accident, equipment failure, system failure, labor dispute, or the failure of any third party to provide any electronic or telecommunication service used in connection with the execution or cancellation of payment orders, provided the Bank shall have exercised such diligence as the circumstances require.

**7. CHOICE OF LAW**

7.1 Consumer Transactions. The Client and the Bank agree that, if a payment order is a portion of a funds transfer in which other portions are subject to the Electronic Fund Transfer Act of 1978 (as in effect from time to time), all actions and disputes between the Client and the Bank concerning that payment order shall be determined pursuant to UCC 4A, as varied by this Agreement.

7.2 Jury Waiver and Governing Law. The Bank and Client hereby waive the right to any jury trial in any action, proceeding, or counter claim under this Agreement brought by either party against the other. This Agreement will be construed in accordance with and governed by the Federal Reserve Bank's operating instructions, applicable federal law and the laws of the State of Louisiana (excluding Louisiana's conflict of laws provisions).

IBERIABANK

**8. NO EXTENSION OF CREDIT**

8.1 Nothing in this Agreement nor any course of dealing between the Client and the Bank constitutes a commitment or obligation of the Bank to lend money to the Client or obligates the Bank to extend any credit to the Client, to make a loan to the Client, or otherwise to advance funds to the Client to pay for any payment order contrary to the Bank's published availability schedules.

**9. AUTHORITY AND OTHER AGREEMENTS**

9.1 Evidence of Authorization. Concurrent with the Client's delivery of this Agreement to the Bank, the Client shall provide to the Bank evidence satisfactory to the Bank of the Client's authority to execute and perform its obligations hereunder and such other documents as the Bank may reasonably require. The Bank is entitled to rely upon such evidence and upon amendments thereto executed by an Authorized Person.

9.2 Other Agreements. The terms and conditions of this Agreement are in addition to, and do not modify or otherwise affect, the terms and conditions of any agreement or arrangement between the parties hereto, including without limitation the Bank's Rules and Regulations Governing Deposit Accounts (the "Rules"). However, to the extent that any inconsistencies exist between the terms and conditions of this Agreement will control.

**10. GENERAL TERMS**

10.1 Taxes. The Client is responsible for all tariffs, duties, or taxes (excluding U.S. federal, state, and local taxation of the income of the Bank) imposed by any government or governmental agency in connection with any payment order executed pursuant to this Agreement

10.2 Amendments. The provisions of this Agreement may be amended only by written agreement executed by an Authorized Person and an officer of the Bank.

10.3 Assignment. Neither party may assign or transfer any of its rights or obligations under this Agreement, except that, after reasonable notice to the Client, the Bank may transfer its rights and obligations under this Agreement to a wholly owned subsidiary of the Bank or to an affiliate of the Bank directly or indirectly wholly owned by the corporate entity that directly or indirectly wholly owns the Bank.

10.4 Termination. Either party may terminate this Agreement by written notice to the other signed by an Authorized Person on behalf of the Client or an officer of the Bank on behalf of the Bank and sent at least 30 calendar days prior to the termination date specified in such notice. No such termination shall affect any claim or cause of action of either party which existed prior to or at the time of the termination.

10.5 Counterparts. This Agreement may be executed by the Client and the Bank in separate counterparts, each of which shall be an original and both of which taken together shall constitute one and the same agreement.

10.6 Notices. Except as otherwise provided herein, all notices required or permitted to be given under this Agreement may be given by any commercially reasonable means. Notice of rejection of any payment order shall be deemed commercially reasonable in the circumstances if given in the manner specified in Section 3 of the Addendum. All notices shall be effective when received, except as may be otherwise provided in this Agreement or by applicable law. If a notice is not received because of the failure or disconnection of the addressed communication system, notice is effective at the time of transmission or dispatch. Each notice given pursuant to this Agreement shall be addressed to the address specified for that purpose below. The Client and the Bank may each change the address for service of written notice upon it by a notice in writing to the other.

10.7 Entire Agreement. This Agreement constitutes the entire agreement and understanding between the Client and the Bank relating to the subject matter of this Agreement as of the date hereof and supersedes all prior agreements and understandings between the Client and the Bank relating to the subject matter of this Agreement.

10.8 Headings. Headings to sections of this Agreement or any Addendum are included for ease of reference and shall not be deemed to create rights, remedies, claims, or defenses arising under the Agreement.

10.9 Severability. In the event that any court or tribunal of competent jurisdiction determines that any provision of the Agreement is illegal, invalid, or unenforceable, the remainder of this Agreement shall not be effected thereby.

10.10 Beneficiaries. This Agreement is for the benefit only of the undersigned parties hereto and is not intended to and shall not be construed as granting any rights to or otherwise benefiting any other person.

IBERIABANK

The parties hereto have entered into this Agreement as of the date first above written.

| | |
|---|---|
| Electronic Maintenance Associates Inc. | IBERIABANK |
| Company Name | |
| Amber M Wiley | Karen Hatcher |
| Vice President | Treasury Management Sales |
| Title | Title |
| 9/3/2015 | 9/3/2015 |
| Date | Date |

Mailing Address:
5220 Langford Park Dr
Norcross GA 30071

Mailing Address:
200 West Congress St
IBT-7 Treasury Management Ops Lafayette, LA 70501

Electronic Address:

Electronic Address: www.iberiabank.com

Limits:

Company - Per Wire Limit: $250,000

Company - Maximum Daily Limit: $250,000

IBERIABANK

# Addendum

Company Name ("The Client"): **Electronic Maintenance Associates Inc.**

Date: **9/3/2015**

This Addendum forms a part of that certain Wire Funds Transfer Services Agreement, by and between IBERIABANK (the "Bank") and the Client.

## 1. DEFINITIONS

1.1 Except as defined in this Addendum, words and phrases shall have the meanings assigned in the Funds Transfer Services Agreement.

1.2 "Agreement" means the Funds Transfer Services Agreement as amended by this Addendum.

1.3 "Authorized Account" has the meaning assigned in § 1.2.3 of the Agreement. An Authorized Account is any account designated on Exhibit B to this Addendum. In the absence of any such designation, any account maintained by the Client at the Bank is an Authorized Account.

1.4 "Authorized Confirmer" means a person authorized to confirm payment orders given to the Bank in the name of the Client, subject to any applicable Security Procedure. Each person designated on Exhibit D to this Addendum is an Authorized Confirmer.

1.5 "Authorized Initiator" means a person authorized to give payment orders in the name of the Client, subject to verification by means of any applicable Security Procedure. Each person designated on Exhibit E to this Addendum is an Authorized Initiator.

1.6 "Authorized Person" has the meaning assigned in § 1.2.4 of the Agreement. Each person designated on Exhibit C to this Addendum is an Authorized Person.

1.7 "Dollar Limit" means an amount, expressed in United States dollars, that is the maximum amount of any individual payment order on which a person assigned a Dollar Limit may act pursuant to the Agreement or the maximum amount of any individual payment order that may be debited to an Authorized Account assigned a Dollar Limit. If a person authorized to act pursuant to the Agreement is not assigned a Dollar Limit, that person's authority to act is not limited in amount. If an Authorized Account is not assigned a Dollar Limit, a payment order of any amount may be debited to that Account.

1.8 "Payment Order Data" means the information required by or permitted by the attached Exhibit A.

1.9 "Personal Identification Number" and "PIN" mean a unique numeric code that will be selected, assigned, changed and controlled by the Bank for each of the Client's Authorized Confirmers, Authorized Initiators and Designated Persons, as applicable.

1.10 "Repetitive Payment Order" means a payment order that conforms in all respects with a Repetitive Payment Order Setup Instruction.

1.11 "Repetitive Payment Order Setup Instruction" means any instruction of the Client to the Bank to execute any payment order containing all of the mandatory Payment Order Data specified in that instruction but that permits the amount and payment date to vary.

## 2. DELIVERY METHOD

2.1 Media for Delivery of Payment Orders. The Bank will accept payment orders from Client delivered to Bank by the following method, as authorized by Client (*Client must indicate the authorized method by initialing the appropriate space*):

[initials] By Facsimile and Other Written instruction
(initials)

IBERIABANK

3. SECURITY PROCEDURES/CLIENT SELECTION

3.1 Verification of Payment Orders/Client Selection. The Bank has established the following Security Procedures for verification of Client payment orders. Those Security Procedures that are optional at the Client's discretion are preceded by a space for initials. The Client has indicated its election of any optional Security Procedures by initialing the appropriate space. The Client acknowledges having made its election of Security Procedures on an informed basis, with a full understanding of the increased risk of loss assumed by the failure to elect all optional Security Procedures. The Client agrees to be bound by any payment order (whether or not authorized) issued in its name and accepted by the Bank in compliance with those Security Procedures elected by Client, as set forth below.

3.1.1 Payment Orders. Any payment order may be verified as an authentic payment order of the Client by the Bank's use of the following Security Procedures:

3.1.1.1 Facsimile and Other Written Instructions.

When giving the Bank a payment order by facsimile transmission or by any writing, an Authorized Initiator must transmit the facsimile to the Bank at the telephone number or deliver the writing to the location designated from time to time by the Bank for those purposes. The person shall identify herself or himself as an Authorized Initiator by supplying the name and signature of an Authorized Initiator on the facsimile or written instruction. The Bank will place a telephone call to the Authorized Confirmer at the telephone number designated by the Client for such person, request to speak to the Authorized Confirmer and obtain the PIN assigned to that Authorized Confirmer from the person purporting to be the Authorized Confirmer. The Bank shall then compare the signature on the instruction received to the genuine signature of the Authorized Initiator.

3.1.1.1.1. Callback Confirmation

After receiving facsimile or other written instructions for a payment order, the Bank will place a telephone call to an Authorized Confirmer at the telephone number designated for such person and request to speak to the Authorized Confirmer. The Bank will obtain the PIN assigned to that Authorized Confirmer from the person purporting to be the Authorized Confirmer and then confirm the Payment Order by obtaining Payment Order Data from that

4. NOTICES. Bank may notify Client of its rejection of Client's payment order by placing a telephone call to an Authorized Initiator at the telephone number designated for such person or by mailing written notification to the Client at the address shown below:

| | |
|---|---|
| Electronic Maintenance Associates Inc. | IBERIABANK |
| Company Name | |
| [signature] Amber M. Wiley | [signature] Karen Hatcher |
| Vice President | Treasury Management Sales |
| Title | Title |
| 9/3/2015 | 9/3/2015 |
| Date | Date |

Mailing Address:
5220 Langford Park Dr
Norcross GA 30071

Electronic Address:

Mailing Address:
200 West Congress St
IBT-7 Treasury Management Ops Lafayette, LA 70501

Electronic Address: www.iberiabank.com

Limits:

Company - Per Wire Limit $250,000

Company - Maximum Daily Limit: $250,000

IBERIABANK

Company Name ("The Client"): Electronic Maintenance Associates Inc.
Date: 9/3/2015

## EXHIBIT A: Payment Order Data

The Client and the Bank agree that each payment order shall be submitted on a completed Wire Transfer request form provided by the Bank. The form must be signed by the Authorized Initiator.

## EXHIBIT B: Authorized Accounts

The Client designates the following accounts as "Authorized Accounts."

| Generate Emails? | Yes |
|---|---|

| Account Number | Account Title | Per Wire (Dollar Limit) | (Dollar Limit) | Email Address |
|---|---|---|---|---|
| 2250884 | EMA Of Pennsylvania Inc. | $250,000 | $250,000 | awiley@emainc.net |
| 2251080 | Electronic Maintenance Associates Inc. | $250,000 | $250,000 | awiley@emainc.net |
| 2251098 | Electronic Maintenance Assoc of NY Inc. | $250,000 | $250,000 | awiley@emainc.net |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

IBERIABANK

**EXHIBIT C:** **Authorized Persons**

The Client designates the following persons as "Authorized Persons."

| Name | Original Signature | Phone Number | Per Wire (Dollar Limit) | Per Day (Dollar Limit) |
|---|---|---|---|---|
| Amber M Wiley | Amber M Wiley | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 770-713-7923 | | |
| Dewey E Mayfield, Jr. | Dewey E Mayfield Jr | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 678-464-9881 | | |
| Vickie J Mayfield | Vickie J. Mayfield | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 770-313-8116 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**EXHIBIT D:** **Authorized Confirmers**

The Client designates the following persons as "Authorized Confirmers."

| Name | Original Signature | Phone Number | Per Wire (Dollar |
|---|---|---|---|
| Amber M Wiley | Amber M Wiley | 770-448-4644 | $250,000 |
| Cell | | 770-713-7923 | |
| Dewey E Mayfield, Jr | Dewey E Mayfield Jr | 770-448-4644 | $250,000 |
| Cell | | 678-464-9881 | |
| Vickie J Mayfield | Vickie J. Mayfield | 770-448-4644 | $250,000 |
| Cell | | 770-313-8116 | |
| | | | |
| | | | |
| | | | |
| | | | |

IBERIABANK

**EXHIBIT E: Authorized Initiators**

The Client designates the following persons as "Authorized Initiators."

| Name | Original Signature | Phone Number | Per Wire (Dollar Limit) | Per Day (Dollar Limit) |
|---|---|---|---|---|
| Amber M Wiley | [signature] | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 770-713-7923 | | |
| Dewey F Mayfield, Jr. | [signature] | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 678-464-9881 | | |
| Vicki J Mayfield | [signature] | 770-448-4644 | $250,000 | $250,000 |
| Cell | | 770-313-8116 | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

# Exhibit "B"

BCS

BRISKIN, CROSS & SANFORD, LLC
ATTORNEYS AT LAW

33 SOUTH MAIN STREET
SUITE 300
ALPHARETTA, GA 30009

TEL: 770.410.1555
FAX: 770.410.3281
WWW.BRISKINLAW.COM

February 24, 2026

**VIA CERTIFIED MAIL NO. 9589 0710 5270 2316 5087 96**
**RETURN RECEIPT REQUESTED**
First Horizon Bank Corporation
Attn: David B. Jordan
165 Madison Avenue
Memphis, TN 38103

**VIA CERTIFIED MAIL NO. 9589 0710 5270 2316 5088 02**
**RETURN RECEIPT REQUESTED**
First Horizon Bank Corporation
c/o CT Corporation System, Reg. Agent
289 S Culver St.
Lawrenceville, GA 30046

Re: **Demand for Refund**

To Whom It May Concern:

My law firm and I have been retained by Electronic Maintenance Associates, Inc. ("EMA") and by Electronic Maintenance Associates of New York, Inc. relating to recent losses sustained while working with your bank. Please direct all future communication in this regard to my attention.

As you are aware, my clients are members of First Horizon Bank Corporation ("First Horizon"). On October 22, 2025, Amber Lamb, who serves as the chief financial officer for both of my clients, received a phone call from a woman claiming she worked at First Horizon. She claimed an individual was attempting to cash a check at the Greenville, TN branch; however, she claimed the transaction had been flagged as potentially one involving fraud. The woman then transferred Ms. Lamb to another individual that claimed to be with First Horizon's fraud department. During the conversation, the caller obtained access to EMA's login information under the guise that he was a representative of First Horizon.

While Ms. Lamb was on the telephone call with the person fraudulently claiming to be a representative of First Horizon, she received a message from First Horizon branch manager Bobbie Docher, who communicated her concern there might be fraudulent activity relating to my clients' accounts. Ms. Lamb was unable to receive the call, believing she needed to maintain the telephone call with the person she believed to be a First Horizon representative. At Ms. Lamb's request, Trey Mayfield, who serves as chief executive officer of my clients, quickly called Ms. Docher shortly after 3:00 p.m., communicating that there definitely was something fraudulent occurring with the account and also communicating that Ms. Lamb was speaking with another First Horizon representative, one we now know to have been part of the fraud, about the issue.

The following morning, Ms. Lamb called Ms. Docher to inform her that she had spoken to the fraud department throughout the prior afternoon and believed that multiple-wire fraud attempts had been stopped. Ms. Docher responded by stating she was concerned something was wrong and requested that my clients' officers meet with her at the bank. Upon arrival, Ms. Docher informed

BCS

BRISKIN, CROSS & SANFORD, LLC
ATTORNEYS AT LAW



Mr. Mayfield and Ms. Lamb that $2,724,290.28 had been wired from my clients' accounts in a series of transactions the prior day. The fraudulent wire transfers appear to have begun at 2:09 p.m. and continued through 6:24 p.m., more than three hours after Mr. Mayfield specifically informed Ms. Docher that there was fraudulent activity relating to the accounts.

Our investigation thus far reveals that (1) our client's agreement with your bank included a maximum amount that could be wired from our client's accounts on a daily basis and (2) that it was exceedingly rare for my clients to have more than two or three wire transfers in a calendar month. These factors should have been sufficient to avoid the losses that followed shortly. There was no instance in the history of my clients' banking relationship with your bank in which this many wire transfers occurred in a day. A series of afternoon transfers of this magnitude is wholly inconsistent with my clients' historical banking practices and bears the hallmarks of fraud. At this time, it is my understanding that $1,385,194.53 has been recovered, as of January 10, through the actions of First Horizon and law enforcement officials, though $1,339,095.75 remains unrecovered as of today. The prospect of further recovery of fraudulently wired funds seems remote.

Despite notice from my client, your negligence allowed for continued wire transfers from my client's accounts. Notwithstanding your negligence, the contract between my client and First Horizon prevents certain amounts from being wired in a twenty-four-hour period. EMA and First Horizon previously known as Iberia Bank, agreed that the daily wire limit is $250,000.00. Not only did you act unreasonably, but you also breached the contract with my client. As such, my client demands reimbursement of the

As such, liability is clear based on the referenced documentation, the breach of contract and financial records reflecting such loss. The total amount due is $1,339,085.75 due to First Horizon's negligence and breach of contract within fourteen days of receipt of this letter. This demand is made in good faith to resolve the matter without litigation. If payment of the demanded amount is not received within fourteen (14) days of receipt of this letter, I will proceed with litigation without further notice. Ample time is given for you to consult with an attorney and/or insurance. In the event you do not comply, my client will seek recovery of all available damages, including principal amount owed, attorneys' fees, cost of litigation, and prejudgment interest to the fullest extent permitted by law.

We are available to discuss this matter at any time, and we look forward to an amicable resolution on the terms set forth herein.

Sincerely,

BRISKIN, CROSS & SANFORD, LLC

Michael D. Cross, Jr.

cc: Trey Mayfield (via email)
Amber Lamb (via email)

E-FILED IN OFFICE - NE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
26-A-03615-11
4/16/2026 5:01 PM
TIANA P. GARNER, CLERK

# General Civil and Domestic Relations Case Filing Information Form

☑ Superior or ☐ State Court of Gwinnett County

**For Clerk Use Only**

Date Filed ____________ MM-DD-YYYY

Case Number 26-A-03615-11

| Plaintiff(s) | Defendant(s) |
|---|---|
| ELECTRONIC MAINTENANCE ASSOCIATES, INC. | FIRST HORIZON BANK CORP |
| Last / First / Middle I. / Suffix / Prefix | Last / First / Middle I. / Suffix / Prefix |
| ELECTRONIC MAINTENANCE ASSOCIATES OF NEW YORK INC. | |
| Last / First / Middle I. / Suffix / Prefix | Last / First / Middle I. / Suffix / Prefix |
| | |
| Last / First / Middle I. / Suffix / Prefix | Last / First / Middle I. / Suffix / Prefix |
| | |
| Last / First / Middle I. / Suffix / Prefix | Last / First / Middle I. / Suffix / Prefix |

Plaintiff's Attorney Michael D. Cross, State Bar Number 198212 Self-Represented ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☑ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

____________ Case Number ____________ Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

____________ Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
05/05/2026
CT Log Number 552124902

## Service of Process Transmittal Summary

**TO:** Chris Hayes, Litigation Paralegal
First Horizon
165 MADISON AVE STE 13
MEMPHIS, TN 38103-2723

**RE:** **Process Served in Georgia**

**FOR:** First Horizon Bank Corp (Assumed Name) (Domestic State: TN)
First Horizon Bank (True Name)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | ELECTRONIC MAINTENANCE ASSOCIATES, INC. and ELECTRONIC MAINTENANCE ASSOCIATES OF NEW YORK, INC vs. FIRST HORIZON BANK CORP |
| **CASE #:** | 26A0361511 |
| **PROCESS SERVED ON:** | C T Corporation System, Lawrenceville, GA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 05/05/2026 at 12:18 |
| **JURISDICTION SERVED:** | Georgia |
| **ACTION ITEMS:** | CT will retain the current log<br>Image SOP<br>Email Notification, Jean Anderson rjanderson@firsthorizon.com<br>Email Notification, Carol Scoggins cascoggins@firsthorizon.com<br>Email Notification, Chris Hayes clhayes@firsthorizon.com<br>Email Notification, Keri Unowsky kgunowsky@firsthorizon.com<br>Email Notification, Amanda Lunceford alunceford@firsthorizon.com<br>Email Notification, Teresa Gifford teresa.gifford@firsthorizon.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System<br>289 S. Culver St.<br>Lawrenceville, GA 30046<br>866-401-8252<br>LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

E-FILED IN OFFICE - NE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
26-A-03615-11
4/16/2026 5:01 PM
TIANA P. GARNER, CLERK

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**

**STATE OF GEORGIA**

**ELECTRONIC MAINTENANCE ASSOCIATES, INC. and ELECTRONIC MAINTENANCE ASSOCIATES OF NEW YORK INC.,**

**Plaintiffs**

**v.**

**FIRST HORIZON BANK CORP**

**Defendant.**

**Civil Action No.** 26-A-03615-11

**SUMMONS**

First Horizon Bank Corp.
c/o CT Corporation System
289 S Culver Street,
Lawrenceville, GA 30046

TO THE ABOVE NAMED DEFENDANT:

You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

Michael D. Cross
Briskin, Cross & Sanford, LLC
33 S. Main Street, Suite 300, Alpharetta, GA 30009
mcross@briskinlaw.com

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This 17th day of April, 2026 day of ________, 20___.

Tiana P. Garner
Clerk of Superior Court

By [signature]
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev'd 1/25